## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| DARREL DUTY, | CASE NO. 5:20-CV-02647-DAP |
| Plaintiff, | JUDGE DAN AARON POLSTER |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Darrel Duty filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying supplemental security income ("SSI"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On November 25, 2020, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 20, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

1

PROCEDURAL BACKGROUND

Mr. Duty filed for SSI on November 20, 2017, alleging a disability onset date of November 20, 2017.[1] (Tr. 74, 196). His claims were denied initially and on reconsideration. (Tr. 73-87, 89-104). He then requested a hearing before an Administrative Law Judge. (Tr. 124-25). Mr. Duty (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on August 30, 2019. (Tr. 32-71). On December 30, 2019, the ALJ issued a written decision finding Mr. Duty not disabled. (Tr. 15-26). The Appeals Council denied Mr. Duty's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; see 20 C.F.R. §§ 416.1455, 416.1481). Mr. Duty timely filed this action on November 25, 2020. (ECF #1).

FACTUAL BACKGROUND

I.     ADMINISTRATIVE HEARING

The following summarizes the testimony of Mr. Duty and VE Eric Dennison, presented during the hearing before the ALJ.

Mr. Duty testified he previously held a license in cosmetology, but has not worked for pay since the 1990s. (Tr. 40-41). He has a driver's license but usually takes transport provided by his insurance company. (Tr. 40).

Mr. Duty lives with friends—a married couple—and used to nanny their two children in exchange for room and board. (Tr. 39, 42). He worked as a nanny for 18 years, taking the children to school, helping them with their education, and preparing meals for them. (Tr. 42-43). The

---

[1]     Mr. Duty initially applied for SSI alleging an onset date of May 17, 1993; he subsequently amended his alleged onset date to November 20, 2017. (Tr. 196).

nanny arrangement ended when the youngest child graduated, two years prior to the hearing. (Tr. 42).

Mr. Duty described his disabling fear of other people, and he is unable to predict how he will react to other people. (Tr. 45). Mr. Duty has a specific triggering fear of men dressed in coveralls or other "industrial-type" clothing. (Tr. 46). His fear of other people includes going into places where people are busy, such as when he has to go shopping. (*Id.*). He can go to places with other people as long as he has someone he knows with him. (Tr. 47). Mr. Duty has treated these fears through 20 years of psychiatric treatment, therapy, and medication. (*Id.*). He meets with a psychiatrist once or twice a month, and a therapist twice per month. (Tr. 48). The medications help, although they do not resolve his symptoms completely, and he sometimes experiences tiredness as a side-effect of his medications. (Tr. 47). The medications help resolve Mr. Duty's suicidal thoughts. (Tr. 48).

Mr. Duty's physical impairments include carpal tunnel syndrome and De Quervain's tenosynovitis[2] in his left hand and thumb. (Tr. 48). Mr. Duty wears wrist braces on both hands. (Tr. 50). He cannot carry over 15 pounds in either hand, although he uses the steel plate in the brace to assist in carrying items. (*Id.*). The wrist braces also aid him in the use of a cane. (*Id.*). In addition, damaged discs in his back limit his ability to sit and stand longer than 30 minutes at a time. (Tr. 48-49). He can walk for about 15 minutes without a cane before the pain in his hips gets too bad. (Tr. 49). Mr. Duty also treats with a pain management specialist and receives medication

---

[2] De Quervain's tenosynovitis is a swelling of the tendons in the wrist and thumb, which can be caused by repetitive actions such as lifting a child repeatedly. *Mayo Clinic*, *De Quervain's tenosynovitis*, https://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis /symptoms-causes/syc-20371332 (last accessed March 14, 2022).

management and physical therapy. (*Id.*). It helps with the back pain, but does not resolve Mr. Duty's fibromyalgia symptoms. (Tr. 50). Mr. Duty receives cortisone shots in his wrists and his hips. (Tr. 51). The shots resolve his hip issues for three months at a time, and resolve his bilateral wrist and thumb issues for a full year before he requires another shot. (*Id.*). Even after receiving the cortisone shot, he still needs to wear the wrist braces. (Tr. 58).

Mr. Duty also experiences migraines about four times per month. (Tr. 51-52). He experiences irritable bowel syndrome flareups about six times per month. (Tr. 59).

Mr. Duty is able to complete activities of daily living as long as he takes rest breaks or can do his chores in shifts. (Tr. 54). He can wash dishes and tidy up for 15-30 minutes before needing to rest. (*Id.*). Mr. Duty is unable to do chores such as sweeping or vacuuming, because the twisting motion exacerbates his hip pain. (*Id.*).

Mr. Duty described his anxiety issues as worsening in the past five years; he is no longer able to do activities he once enjoyed, such as going to the mall or seeing movies. (Tr. 54-55). He now partakes in quiet, artistic-type hobbies such as writing, embroidery, or cross-stitch, for as long as his hands will allow. (Tr. 55-56).

The ALJ then posed a series of hypotheticals to the VE.

The first hypothetical assumed an individual of Mr. Duty's age and education, who can perform light work, and can occasionally operate hand controls and frequently handle or finger with his bilateral upper extremities; can occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds; who can frequently balance and occasionally stoop, kneel, crouch, or crawl; the individual must avoid all exposure to workplace hazards such as unprotected heights; can perform simple, routine tasks but not at a production rate pace or with strict production

4

quotas; who can interact occasionally with others but have no responsibility for sales, arbitration, negotiation, confrontation, conflict resolution, or the safety or welfare of others; and the individual can adapt to occasional changes in the work setting or routine so long as those changes are explained in advance and implemented gradually. (Tr. 61).

The VE identified three jobs that the hypothetical individual could perform:

- Garment sorter (DOT 222.687-014): SVP 2, unskilled, light, 115,000 jobs in the national economy; [3]

- Marker (DOT 209.587-034): SVP 2, unskilled, light, 52,000 jobs in the national economy; and

- Mail clerk, nongovernmental (DOT 209.687-026): SVP 2, unskilled, light, 43,000 jobs in the national economy.

(Tr. 61-62).

The second hypothetical kept the limitations in the first hypothetical, but added additional limitations, including the individual can never interact with members of the public as part of the job duties, and must avoid all exposure to bright lights such as headlights, flashlights, spotlights, or strobe lights. (Tr. 62). The VE confirmed that the three positions previously identified would have no interaction with the general public and no exposure to lights brighter than an average office setting and, therefore, could be performed by the hypothetical individual. (Tr. 62-63).

The third hypothetical kept the previous two sets of limitations, with the addition that the individual could stand and walk four hours in an eight-hour workday; must be permitted to alternate positions between standing and sitting at intervals of 30 minutes or longer, while

---

[3] "DOT" refers to the *Dictionary of Occupational Titles*, published by the Department of Labor. 20 C.F.R. § 404.1566(d). "SVP" stands for "Specific Vocational Preparation" and refers to the amount of time a typical worker requires to learn the techniques, acquire the information, and develop the facility needed for average performance of a job. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 851 n.6 (6th Cir. 2010).

remaining on task at the workstation. (Tr. 63). The VE again confirmed that the three positions previously identified could be performed by the hypothetical individual so limited without an effect on the job titles. (Tr. 63-64). However, the VE testified that the job numbers available in the national economy would need to be reduced by 50 percent to accommodate the sit/stand requirement. (*Id.*). The VE confirmed that the sit/stand option and the reduction in numbers were not addressed in the DOT and he relied on his own knowledge and experience for this testimony, because the DOT considers light jobs to require up to six hours of standing and walking, not four as provided in the hypothetical. (Tr. 64).

The fourth hypothetical kept the limitations from the first two hypotheticals, but further limited the individual to sedentary work. (Tr. 64). The VE testified the individual could perform the following positions:

- Ink printer (DOT 652.685-038): SVP 2, unskilled, sedentary, 87,000 jobs available nationally;

- Dial marker (DOT 729.684-018): SVP 2, unskilled, sedentary, 6,500 jobs available nationally; and

- Hand mounter (DOT 976.684-018): SVP 2, unskilled, sedentary, 5,500 jobs available nationally.

(Tr. 64-65).

The fifth hypothetical assumed an individual with the same limitations as in the fourth, but who requires the use of a cane for ambulation longer than fifteen minutes. (Tr. 65). The VE testified that the individual could perform the same sedentary jobs identified, because those jobs are performed at a desk or table setting where the individual would not be required to move more than five feet away from the center position at the workstation. (*Id.*). The hypothetical individual could also perform the previously identified light jobs with a cane, as those were also performed at

6

a table or desk setting. (Tr. 66). The hypothetical individual would not be required to move more than a few feet left or right of center in any of the jobs identified. (*Id.*).

Finally, the ALJ inquired about off-task time and absenteeism. The VE testified that in his experience, employers would tolerate up to 10 percent off-task time; anything more than that would be work preclusive. (*Id.*). Employers would tolerate one day per month absent; above that would be work preclusive. (*Id.*).

In response to a question from Mr. Duty's counsel, the VE testified that the positions identified required frequent fingering and handling. (Tr. 68). However, the VE declined to speculate regarding the effect of wearing a hand brace. The six identified positions would be eliminated if the individual were reduced to occasional handling. (Tr. 67-68). If the individual had a routine crying spell, either on a weekly or monthly basis, an employer would have little tolerance for such a disruption and would find it to be work preclusive. (Tr. 69-70).

## II.    PERSONAL AND VOCATIONAL EVIDENCE

Mr. Duty was born on April 2, 1969, making him 48 years old at the time of his alleged onset date, and 50 years old at the time of the administrative hearing. (Tr. 24). Mr. Duty has a high school equivalent education. (*Id.*). Mr. Duty has no past relevant work. (*Id.*).

## III.    RELEVANT MEDICAL EVIDENCE[4]

**Dr. Bhalla.** On April 29, 2016, Mr. Duty visited Vivek Bhalla, M.D., complaining of right hip pain. (Tr. 326). Dr. Bhalla recorded Mr. Duty as having pain in his right hip for the past five

---

[4]    Mr. Duty only raises error as to the ALJ's treatment of his physical impairments of bilateral hands and hip, the ALJ's consideration of Dr. Shah's opinion of the same, and the ALJ's consideration of Dr. McCullough's opinion of Mr. Duty's mental health limitations. (Pl.'s Br., ECF #14, PageID 976-90). As such, he waives argument on issues not raised in the opening brief.

years, but had worsened over the past three months. (*Id.*). The pain was improved with rest and worsened when going down stairs; sleeping with a pillow between his legs improved his symptoms at night. (*Id.*). Mr. Duty also complained of pain, weakness, and aches in his right hand, with tingling in all five fingers. (*Id.*) Mr. Duty described pain in his left hand for the past six months as well. (*Id.*).

Dr. Bhalla noted Mr. Duty was positive for arthralgias and gait problem, and negative for myalgias and joint swelling. (Tr. 327). On examination, Dr. Bhalla noted Mr. Duty had a "mildly antalgic gait, pain in right groin with logroll." (Tr. 329). Dr. Bhalla also found "questionable" Tinel signs in Mr. Duty's hands bilaterally, but examination was otherwise normal with full range of motion. (Tr. 329). Dr. Bhalla assessed Mr. Duty with right hip pain, disturbance of skin sensation, and polyarthralgia. (*Id.*).

Mr. Duty reported significant improvement on May 27, 2016 after having received a hip injection. (Tr. 336). Mr. Duty was following up with sports medicine for his wrist. (*Id.*). Rheumatology and autoimmune labs returned normal results. (*Id.*). Follow-up visits on August 29, 2016 and February 28, 2017 noted no issues with Mr. Duty's hip or hands; he exhibited normal range of motion and no tenderness on examination. (Tr. 341-53).

On August 31, 2017, Mr. Duty reported he had several falls since the last office visit, and was under the care of Dr. Shah. (Tr. 354). The examination appeared otherwise normal, but for complaints of dizziness. (Tr. 354-60).

---

*Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). I summarize only the evidence relevant to the claims Mr. Duty has advanced.

**Summa Health.** Mr. Duty treated his bilateral hand and hip pain at Summa Health with Nilesh Shah, M.D., and Robert Crawford, M.D., both sports medicine physicians. (*See, e.g.*, Tr. 427-85).

On May 11, 2016, Mr. Duty saw Dr. Crawford for bilateral hip pain. (Tr. 485). Mr. Duty complained of pain with inactivity, lateral movements, pivoting, rising after sitting, and squatting. (*Id.*). His pain was not improved with over-the-counter analgesics or by home exercise. (Tr. 485-86). His right hip range of motion was abnormal, including pain at extremes. (Tr. 489). Mr. Duty presented with decreased muscle strength in the right hip and positive FABER tests. (*Id.*). His muscle strength was decreased in the left hip, but examination was otherwise normal. (Tr. 489-90). Dr. Crawford diagnosed Mr. Duty with mild to moderate osteoarthritis of both hips, confirmed by x-ray imaging. (Tr. 490). After discussing injection therapy and the potential for surgery, Mr. Duty agreed to proceed with therapeutic hip injection by ultrasound guidance, in combination with physical therapy. (*Id.*).

On May 25, 2016 and February 2, 2017, Mr. Duty received Celestone and lidocaine injections for his hip pain. (Tr. 475, 480). Mr. Duty tolerated the procedure without complications. (Tr. 478, 484).

Mr. Duty presented to Summa Health on February 23, 2017 for evaluation of his bilateral hand problems. (Tr. 467). He complained of sharp pain at a seven on a ten-point scale in his left hand, and worse when gripping his thumb in his hand. (*Id.*). Mr. Duty also endorsed occasional numbness in the thumb of his left hand. (*Id.*). Mr. Duty described a loss of dexterity in his hands, with frequent dropping of items and difficulty buttoning. (*Id.*). Mr. Duty also noted three recent falls despite post-injection improvement in his hip. (Tr. 467-68). Mr. Duty did not present with

gait problems at this visit, but used a walking stick. (Tr. 470, 472). Mr. Duty had normal range of motion in his right hand with no tenderness but positive Tinel's sign. (Tr. 471). He had tenderness in his left hand over the first dorsal compartment and pain in the grind test of his first carpometacarpal joint, with normal range of motion. (Tr. 471-72). X-ray imaging noted arthritic changes in the first carpometacarpal joint. (Tr. 472). Dr. Shah administered a Celestone and lidocaine injection in the left carpometacarpal joint and in the right carpal tunnel without complication. (Tr. 473).

Notes from April 6, 2017 indicate Mr. Duty presented with tenosynovitis of the left hand and carpal tunnel syndrome of his right hand. (Tr. 459). Mr. Duty reported near complete improvement in his left hand post-injection six weeks prior. (*Id.*). Mr. Duty was significantly more functional on his left, and had the ability to do fine needlework. (*Id.*). Mr. Duty's right hand was not improved despite injection and wearing of a wrist splint. (*Id.*). Mr. Duty had sensitivity in the middle of the palm and numbness in his right hand, with the most profound numbness in the third and fourth digit of his right hand, but no numbness or tingling proximal to the wrist. (*Id.*; Tr. 463). He had normal bilateral wrist range of motion. (Tr. 463-64). Mr. Duty reported some neck pain with occasional radiation down his arm and into his hand. (Tr. 459). Mr. Duty was positive for arthralgias, numbness, and headaches, and negative for gait problems and weakness. (Tr. 462). Dr. Shah indicated the steroid injections appeared to improve Mr. Duty's joint arthritis in his left hand, and advised Mr. Duty to keep using the soft splint and begin physical therapy. (Tr. 465). Dr. Shah noted only mild improvement in Mr. Duty's right hand with the use of nighttime splints and encouraged Mr. Duty to continue wearing the splints during the day as well. (*Id.*). Dr. Shah recommended ultrasound injection of the right carpal tunnel, with surgery recommended if

10

this injection did not improve his symptoms. (*Id.*). Mr. Duty's hip pain was improved by injection, but Dr. Shah recommended physical therapy as well. (*Id.*).

On May 24, 2017, Dr. Shah noted Mr. Duty has moderate carpal tunnel syndrome based on the results of a prior EMG study. (Tr. 453). Dr. Newman performed a Celestone and lidocaine injection on Mr. Duty's right carpal tunnel under Dr. Shah's supervision. (*Id.*, Tr. 457-58). Mr. Duty had decreased sensation in the palmar aspect of the second, third, and fourth digits of his right hand. (Tr. 457). Mr. Duty was negative for gait problems or arthralgias at this visit. (Tr. 456).

Mr. Duty presented to Dr. Shah for evaluation of his chronic low back pain and bilateral foot pain on June 29, 2017. (Tr. 445). Mr. Duty rated his pain at worst a six on a ten-point scale. (*Id.*). The pain in his back did not radiate down his legs, and Mr. Duty denied any progressive weakness in his legs. (*Id.*). Mr. Duty's foot pain was worse when he was on his feet or tiptoes and improved by sitting down. (*Id.*). Mr. Duty denied numbness or weakness in his feet. (Tr. 446). He did not have problems with gait and had normal stride, cadence, toe off, and heel strike. (Tr. 449). He was positive for arthralgias. (*Id.*). Dr. Shah noted a normal range of motion in Mr. Duty's lumbar spine, although he had pain in the anterior groin in the straight leg raise test. (*Id.*). Mr. Duty presented with pain in the palpation of the arch in the bilateral feet. (Tr. 449-50). Imaging of the hip and bilateral feet was completed. (Tr. 450). Dr. Shah indicated Mr. Duty's back pain was related to coccydynia and right sacroiliac joint dysfunction. (Tr. 451). Mr. Duty's foot pain was related to posterior tibialis tendon dysfunction and intrinsic muscle weakness of the feet. (*Id.*). Dr. Shah recommended purchasing an orthotic at a running store, as Mr. Duty was of limited means to obtain a custom molded orthotic; Dr. Shah also recommended an airlift PTTD ankle brace. (*Id.*). Mr. Duty reported improvement in his hand pain after injection at the previous visit. (*Id.*).

11

On July 26, 2017, Mr. Duty presented to Dr. Shah for a right hip injection. (Tr. 439). Dr. Shah noted no arthralgias, weakness, or gait problems at this visit. (Tr. 442). Dr. Shah completed the lidocaine injection in Mr. Duty's right sacroiliac joint; Mr. Duty reported feeling better as he ambulated out of the office. (Tr. 443).

On September 28, 2017, Mr. Duty presented with general pain all over his body, and increasing pain in his hands and hip. (Tr. 433). Mr. Duty reported his pain increasing after the death of his girlfriend, and exacerbated by the care she required prior to her passing. (*Id.*). Mr. Duty reported feeling as if he was on a lot of medication but not seeing relief, and wished to try new physical therapies. (*Id.*). The injections he previously received did not seem to help as much as they had before. (*Id.*). Mr. Duty's gait was slow, and he used a cane at this visit. (Tr. 437). Dr. Shah recommended follow-up with a psychiatrist for the grief and its interrelation with his pain syndromes. (Tr. 438). Dr. Shah also recommended Mr. Duty meet with pain management for possible radiofrequency ablation for his sacroiliac joint problem. (*Id.*).

On December 4, 2017, Mr. Duty presented complaining of hand pain. (Tr. 427, 722-29). Dr. Shah reviewed Mr. Duty's past treatment, including a left carpometacarpal joint injection in February 2017 and a right carpal tunnel injection in April 2017. (Tr. 427). Mr. Duty reported the pain started to return in November 2017. (*Id.*). Dr. Shah recorded a past diagnosis of primary osteoarthritis of the right hip on May 25, 2016. (*Id.*). Mr. Duty presented with weakness on the entire right side of his body. (Tr. 431). His coordination was normal. (*Id.*). Dr. Shah assessed Mr. Duty with primary osteoarthritis of the first carpometacarpal joint of the left hand. (Tr. 431). Dr. Shah administered a lidocaine and Celestone injection in Mr. Duty's left first carpometacarpal

joint. (Tr. 432). Dr. Shah recommended Mr. Duty continue to use the brace, but to wean with use of an exercise program as tolerated. (*Id.*).

On September 5, 2018, Mr. Duty attended an appointment for an ultrasound guided right hip injection. (Tr. 730). Dr. Shah recorded that Mr. Duty experienced recurring pain the past three months, exacerbated by walking down stairs. (*Id.*). The Celestone and lidocaine injection was performed without complication, and Mr. Duty experienced an immediate improvement in his symptoms. (Tr. 734).

**Akron Neurology.** Intake notes from Akron Neurology on October 19, 2017 indicate Mr. Duty had right arm and leg weakness, beginning four years prior and worsening over the past year. (Tr. 410, 583). Mr. Duty reported he cannot feel his leg while walking and uses a cane. (*Id.*). Mr. Duty reported he had prior injections in his lower back for pain, but continued to experience pain. (*Id.*). Mr. Duty reported no trauma, urinary, or bowel incontinence, and no numbness or tingling. (*Id.*). Examination demonstrated 4/5 motor strength in right upper and lower extremities, which were noted as "effort related." (Tr. 412, 585). His gait was normal. (Tr. 413, 586). Differential diagnosis indicated radiculopathy and polyneuropathy. (*Id.*). Raed Azzam, M.D., recommended Mr. Duty continue to wear a right-hand brace. (Tr. 414, 587).

Diagnostic results from November 17, 2017, and reviewed on February 1, 2018, indicated mild neurogenic changes in the right leg suggesting the presence of mild, chronic, lumbosacral radiculopathies involving the right L5 and L4 nerve root levels. (Tr. 581, 592-95). Neurogenic changes were also present in the right arm, suggesting the presence of mild, chronic, cervical radiculopathy involving the right C6 and C7 nerve root levels. (*Id.*). Moderate carpal tunnel syndrome was present in the right hand. (*Id.*). Dr. Azzam recommended treatment with verapamil

13

and amitriptyline, a psychiatrist consult for cognitive behavioral therapy, and a consult with pain management for Botox injections. (*Id.*). For Mr. Duty's right arm and leg weakness, Dr. Azzam recommended a brace for the carpal tunnel syndrome, physical and water therapy for the radiculopathy, and pain management for the spinal epidural injections. (Tr. 582).

**Comprehensive Pain Management Specialists.** Mr. Duty treated with Marisa Wynne, D.O., at Comprehensive Pain Management Specialists. (*See, e.g.*, Tr. 493-501). On October 6, 2017, Mr. Duty presented with lower back pain, rated a nine at worse, four at best, and average six on a ten-point scale. (Tr. 497). Mr. Duty reported numbness in his right hip, and that his right lower extremity will "give out." (*Id.*). Past sacroiliac joint injection was ineffective. (*Id.*). Mr. Duty was able to rise from a seated position with difficulty. (Tr. 498). He had tenderness in the lumbar spine and coccyx, and decreased range of motion and sacroiliac tenderness bilaterally. (Tr. 499). He used a cane at the appointment. (*Id.*). Dr. Wynne started Mr. Duty on Gabapentin. (Tr. 500).

On November 3, 2017, Mr. Duty described his pain as constant, worsened by activity, walking, and standing a long time. (Tr. 493). Mr. Duty treated with heat/cold and sacroiliac joint injection, although he reported no relief from diagnostic injections. (Tr. 493-95). Gabapentin was stopped due to increased numbness and "dark thoughts." (*Id.*). Mr. Duty was able to rise from a seated position with difficulties. (*Id.*). Dr. Wynne recommended participation in the Chronic Pain Rehab Program at the Cleveland Clinic, but Mr. Duty was unable to attend due to the distance. (Tr. 495).

Dr. Wynne ordered an MRI of Mr. Duty's pelvis and lumbar spine, which was performed on December 19, 2017. (Tr. 654, 656). The MRI showed minimal degenerative changes of the bilateral sacroiliac joints, with no evidence of sacroiliitis or stress fracture. (Tr. 654-55). There was

14

moderate tendinosis with low-grade partial-thickness interstitial tearing on the right gluteus minimus and medius, mild tendinosis of the gluteus minimus and medius without tearing on the left, and there was mild tendinosis and low-grade partial-thickness interstitial tearing of the conjoined tendon origin." (Tr. 655). The spinal MRI showed mild disc bulge at L4-L5 "with tiny superimposed focal protrusion and annular fissure." (Tr. 656). There was mild disc space narrowing at L4-L5. (*Id.*). There was no central or foraminal stenosis present at any level. (Tr. 657).

On March 12, 2018, Mr. Duty was treated by Leann Whyte, NP-C. (Tr. 641). Mr. Duty reported a recent EMG showed weakness on the right side of his body due to a pinched nerve in his neck. (*Id.*). Mr. Duty had physical therapy in his pelvis and hips since his last visit, but it did not help his pain; Mr. Duty asked about starting aqua therapy. (*Id.*). Nurse Whyte put in an order for aqua therapy. (Tr. 643). Mr. Duty exhibited tremoring with sustained pressure on his right arm and leg. (Tr. 642). Mr. Duty walked with a cane and used bilateral wrist braces. (*Id.*).

On May 1, 2018, Mr. Duty was treated by Guang Yang, M.D. (Tr. 637). Dr. Yang noted Mr. Duty could rise from a seated position with difficulty. (*Id.*). Mr. Duty exhibited sacroiliac joint tenderness bilaterally, decreased range of motion in his lumbar spine, and multiple trigger points on examination. (Tr. 638). Mr. Duty walked with a cane and wore bilateral wrist braces. (*Id.*). Dr. Yang started Mr. Duty on Lyrica and cyclobenzaprine. (Tr. 639).

On June 11, 2018, Mr. Duty reported increased muscle spasms. (Tr. 632). Mr. Duty was able to rise from a seated position with difficulty. (Tr. 633). He had tenderness of the sacroiliac joint and piriformis bilaterally and decreased range of motion of the lumbar spine. (*Id.*). Mr. Duty used a cane and wore bilateral wrist braces. (*Id.*). Nurse Whyte continued Mr. Duty on Lyrica and

cyclobenzaprine for his pain. (Tr. 634-35). Mr. Duty experienced severe side effects from the Neurontin, including hallucinations. (Tr. 635).

On August 13, September 17, October 15, and December 3, 2018, Mr. Duty presented with bilateral sacroiliac joint tenderness. (Tr. 617, 621, 625, 629). Nurse Whyte noted Mr. Duty exhibited tremoring with sustained pressure on his right arm and leg. (*Id.*). Mr. Duty was wearing bilateral wrist braces and used a cane. (*Id.*). At his September 17, 2018 appointment, Mr. Duty reported walking regularly. (Tr. 626). Mr. Duty reported a worsening of pain after mopping the floor. (Tr. 618). Mr. Duty reported more upper back pain with sensitivity to touch. (*Id.*). Nurse Whyte indicated possible fibromyalgia. (*Id.*). Nurse Whyte recommended considering a caudal epidural steroid injection vs. coccygeal nerve block if the back pain persists, and a cervical MRI due to symptoms of weakness. (Tr. 631).

On February 4, 2019, Mr. Duty exhibited tremoring in his right arm and leg, and multiple trigger points and tenderness. (Tr. 716). He used a cane and wore bilateral wrist braces. (*Id.*). Nurse Whyte indicated Mr. Duty's pain appeared better controlled with Lyrica and improved with at-home yoga exercises. (Tr. 717). Nurse Whyte maintained Mr. Duty on his medication regimen. (*Id.*).

On April 1, 2019, Mr. Duty indicated that the medications seemed to be losing effectiveness and requested an increase in his medications. (Tr. 710). Mr. Duty exhibited tremors with sustained pressure on his right arm and leg, and multiple trigger points and tenderness. (Tr. 711). He used a cane and wore bilateral wrist braces. (*Id.*). Mr. Duty reported he had one session of physical therapy and would proceed with aquatic therapy. (Tr. 712). Nurse Whyte increased Mr. Duty's Lyrica dosage. (*Id.*).

16

On June 10, 2019, Mr. Duty reported his neurologist suggested injections. (Tr. 706). He was able to rise from a seated position with difficulty, walked with a cane, and wore bilateral wrist braces. (Tr. 706-07). Nurse Whyte maintained Mr. Duty on his medication regimen. (Tr. 707-08).

**Falls Foot and Ankle Clinic.** Mr. Duty presented to the Falls Foot and Ankle Clinic on October 18, 2017, complaining of diffuse pain in his feet bilaterally. (Tr. 424). Stacey Martin, DPM, noted Mr. Duty's back issues, carpal tunnel syndrome, and hip pain. (*Id.*). Dr. Martin noted pain with range of motion, although range of motion appeared to be within normal ranges. (*Id.*). Dr. Martin noted no arthritic changes. (*Id.*). Dr. Martin suggested possible fibromyalgia due to Mr. Duty's diffuse pain without other symptoms present. (*Id.*). Mr. Duty returned to be fitted with an orthotic on October 26, 2017; however, due to neurology results, he was not cast for an orthotic. (Tr. 425). Dr. Martin provided Mr. Duty an ankle stability brace; he reported feeling more stable on ambulation with the brace. (*Id.*).

At a follow-up visit on November 22, 2017, Mr. Duty reported increased stability with the ankle brace, but continued pain in his right foot. (Tr. 426). Mr. Duty did not appear to have steppage gait or use his thigh to pick up his right foot, although he did adduct greater on the right than the left. (*Id.*). Dr. Martin administered an injection in Mr. Duty's right foot and advised that he continue wearing the ankle brace. (*Id.*). Dr. Martin provided Mr. Duty with a prescription for a handicap placard. (*Id.*).

**Portage Path Behavioral Health.** Mr. Duty regularly treated for his depression and anxiety with Christopher Foscue, M.D., at Portage Path Behavioral Health. (*See, e.g.*, Tr. 502-05). Dr. Foscue noted Mr. Duty's diagnoses of severe major depressive disorder, anxiety disorder, and personality disorder with borderline and schizotypal traits were stable. (Tr. 600, 605).

Mr. Duty attended his regular appointments on November 8, December 6 and 20, 2016, January 3, February 7 and 21, March 14 and 28, April 18, May 2, June 13, July 10 and 24, 2017, and Dr. Foscue noted no significant change in Mr. Duty's mental health. (Tr. 529, 532, 535, 541, 544, 547, 550, 553, 556, 560, 563, 566, 569). His associations were intact, and judgment and insight were fair. (Tr. 529, 532, 536, 541, 544, 550, 556, 560, 563, 569). Dr. Foscue continued Mr. Duty on medication and therapy treatment plan with a recommendation to return in two weeks. (Tr. 530, 533, 536, 542, 548, 551, 554, 557, 561, 564, 567, 570). At most appointments, Mr. Duty presented with blunted affect but was otherwise cooperative with a euthymic mood. (Tr. 529, 532, 547, 550, 553, 556, 560, 566).

On April 18, 2017, Dr. Foscue started Mr. Duty on prazosin to control Mr. Duty's "apocalyptic dreams," which he tolerated well and experienced a reduction in dreams. (Tr. 541, 545).

At his appointment on May 30, 2017, Dr. Foscue increased Mr. Duty's dosage of Xanax, but recommended that he eventually wean himself off benzodiazepines. (Tr. 538-39). Dr. Foscue discussed Mr. Duty's medications, dosages, and frequency (Mr. Duty was on three antidepressants at "significant doses"), and made adjustments to his medication treatment. (Tr. 538-40). Dr. Foscue indicated he would continue to target Mr. Duty's anxiety, agoraphobia, and self-esteem issues. (Tr. 539).

On August 3, 2017, Mr. Duty presented with good insight and a strong desire to reduce his psychiatric symptoms. (Tr. 527). He created a treatment plan with Dr. Foscue to include stabilizing his mental health symptoms through the use of medication management with a goal of maximizing his independence. (Tr. 527). Dr. Foscue noted Mr. Duty's progress was improving. (Tr. 528).

Mr. Duty presented to his appointments on August 21, September 18, October 2, and December 11 and 18, 2017, and January 29 and February 19, 2018 with no significant change in his mental health. (Tr. 518, 521, 524, 599, 603, 608, 611). His associations were intact, and judgment and insight were fair. (Tr. 518, 521-22, 524-25, 599, 604, 608). Dr. Foscue adjusted Mr. Duty's medications on January 29, 2018. (Tr. 603-05). Dr. Foscue continued on his medication and therapy treatment plan with a recommendation to return in two weeks. (Tr. 519-20, 522-23, 526, 601, 605, 609).

On August 21, 2017, Mr. Duty expressed some doubts for his need to continue with therapy for twenty years; Dr. Foscue encouraged him to continue if he felt benefit from the therapy. (Tr. 524). Mr. Duty requested information on a neurologist that takes his insurance; Dr. Foscue provided him with a list of nearby providers. (Tr. 525).

Notes from visits on October 16 and 30 and November 27, 2017 indicate Mr. Duty was having issues with taking gabapentin for his pain; Dr. Foscue adjusted his other medications in response. (Tr. 509, 512, 515). At follow-up on November 27, 2017, Mr. Duty reported some increase in depression and obsessive-compulsive disorder symptoms, which he attributed not to the medication change but rather to stress at home (*Id.*). At these appointments, Dr. Foscue continued Mr. Duty on the current medication dosages and treatment plan. (Tr. 510-11, 514, 516-17).

On December 11, 2017, Mr. Duty reported disturbing dreams and that past events were "coming up" and he was ready to deal with them. (Tr. 506). His insight and judgment were noted to be fair. (Tr. 507). Dr. Foscue noted Mr. Duty has chronic passive suicidal ideation, but without intent or plan and did not present for increased risk. (Tr. 507). Dr. Foscue continued Mr. Duty on

19

his treatment plan of medication management and therapy with a recommendation to return in two weeks. (Tr. 508).

Mr. Duty's appointment on December 18, 2017 was normal, his judgment and insight were fair, and he had good attention and concentration with minimal distractibility. (Tr. 503). He presented with moderate anxiety and mild depression. (Tr. 504). Dr. Foscue continued with medication management and therapy, with a recommendation to return in two weeks. (*Id.*).

**Greater Akron Psychiatry.** Mr. Duty underwent an initial psychological evaluation on October 22, 2018, administered by Amanda Rose, PsyD. (Tr. 694-703). Mr. Duty reported a 30-year history of depression, anxiety, panic attacks, and obsessive-compulsive disorder behaviors. (Tr. 694). Mr. Duty was diagnosed with major depressive disorder (persistent), post-traumatic stress disorder, schizophrenia, borderline traits, and generalized anxiety disorder. (Tr. 695, 698). He described apocalyptic nightmares, uncontrolled by his current medication. (Tr. 694-95). Mr. Duty used a cane at this appointment. (Tr. 695). Mr. Duty exhibited good insight and intact judgment, with no evidence of thought disturbance, hallucinations, delusions, or neurocognitive disability. (*Id.*). He was cooperative and pleasant during the session. (*Id.*). Dr. Rose recommended a course of outpatient cognitive behavioral therapy (CBT), in collaboration with the referring provider. (Tr. 697).

Mr. Duty attended a CBT appointment on November 5, 2018. (Tr. 701-02, 777-80). Mr. Duty responded well during the session and exhibited motivation in therapy and active evaluation of his internal dialogue and negative thinking. (Tr. 702, 777). Dr. Rose recommended follow-up in two weeks. (*Id.*).

On December 20, 2018, Mr. Duty attended a CBT appointment with Dr. Rose. (Tr. 781). Mr. Duty experiences flashbacks, hypervigilance, and avoids people due to a fear of being harmed. (*Id.*). Mr. Duty reported an improved mood and more effective handling of his mental health symptoms. (*Id.*). He was cooperative and motivated in therapy. (Tr. 782). Dr. Rose recommended follow-up in two weeks. (*Id.*).

On January 28, 2019, Mr. Duty acknowledged the interrelation between his symptoms of anxiety and depression and his physical pain. (Tr. 785-86). He had not completed the homework assigned in his previous sessions, but was cooperative and identified strengths and negative thoughts. (*Id.*). Dr. Rose recommended using mindfulness to manage his pain. (Tr. 786).

After a several-month hiatus, Mr. Duty next returned for CBT on April 22, 2019. (Tr. 790). Mr. Duty acknowledged that his symptoms of pain were likely psychosomatic and related to worry and stress. (*Id.*). Mr. Duty reported the past trauma he experienced, starting at age five and the negative thoughts that have continued since the childhood abuse. (*Id.*). Dr. Rose noted physical responses to his pain, including Mr. Duty's seated position, slow gait, and ambulation with a cane. (Tr. 791). Dr. Rose reevaluated Mr. Duty's expressed goals, including past trauma and relation to psychosomatic physical pain response, and presented a plan to begin addressing past abuse. (*Id.*).

Mr. Duty also treated with Drs. Raquin Hoq, Rajesh Tampi, and Flynn McCullough and attended regular appointments for medication management of his mental health diagnoses. (Tr. 828-39). On November 5, 2018, Mr. Duty complained of severe anxiety and panic attacks, and symptoms of depression. (Tr. 827). However, he noted feeling hopeful regarding the relationship with his psychologist, Dr. Rose, and reported starting on the homework from the last

appointment. (*Id.*). Dr. Hoq noted Mr. Duty might improve with the addition of Cymbalta, which may also improve the pain in his wrists. (Tr. 828). Dr. Hoq began a Cymbalta prescription and reduced Xanax while maintaining the other medications. (Tr. 828-29).

On December 20, 2018, Mr. Duty reported past trauma associated with the Christmas holiday, but despite conflicting feelings, he described feeling better in overall mood and anxiety. (Tr. 821-22). He reported doing well with a decrease in his Xanax prescription and would like to reduce the dosage further. (Tr. 822). Dr. Hoq reduced the Xanax dosage and continued Mr. Duty's medication regimen with respect to his other prescriptions. (Tr. 822-24).

On January 14, 2019, Mr. Duty reported tolerating the decrease in Xanax and increase in Cymbalta well. (Tr. 817-18). He had a few bad days and contemplated suicide, but had improved by the appointment date and noted positive changes in his life. (Tr. 817-20). Dr. Hoq stopped the Xanax prescription and continued Mr. Duty's Cymbalta, Seroquel, Remeron, and prazosin medications. (Tr. 818).

At his March 25 and April 22, 2019 appointments with Dr. Tampi, Mr. Duty described a loud, high-pitched static sound that "seems to undulate throughout the day" and interfered with his ability to focus. (Tr. 810, 813). Mr. Duty reported that he previously took Seroquel at doses of 600 mg that resolved the noise when he had heard it before. (Tr. 813). However, in this instance, the increased dose of Seroquel did not improve the noise he hears. (Tr. 810). Mr. Duty's Seroquel dosage was increased to 400 mg to treat the noise hallucination, and Cymbalta dosage increased to treat anxiety and fibromyalgia symptoms. (Tr. 811, 814-15). He was using a walker at the April 22, 2019 visit. (Tr. 810).

On July 9, 2019, Mr. Duty was treated by Drs. Tampi McCullough. (Tr. 806-09). Mr. Duty reported worsening anxiety, and previous auditory hallucinations. (Tr. 806). Dr. Tampi continued Mr. Duty on a medication plan of Seroquel, prazosin, and Cymbalta, along with individual psychotherapy with Drs. Gilbertson and Rose. (Tr. 807). Dr. Flynn noted Mr. Duty reported consistent improvement from his Seroquel prescription and the recent increase in dose. (Tr. 808). Mr. Duty reported persistent PTSD and denied mitigating factors to improve symptoms. (*Id.*). Dr. McCullough made no medication changes and recommended Mr. Duty continue to follow up with the clinic for psychopharmacology. (Tr. 809).

## IV.  MEDICAL OPINIONS

**State Agency Medical Consultants.** State agency medical consultants reviewed Mr. Duty's record at the initial and reconsideration levels. (Tr. 72-104).

On January 17, 2018, State agency psychological consultant, Leslie Rudy, Ph.D., opined that Mr. Duty was moderately limited due to mood symptoms interfering with his motivation and concentration, but was able to perform simple one- to four-step tasks in an environment without demands for fast pace or high production, could interact on an occasional and superficial basis despite dysfunctional interactional patterns, and could adapt to occasional changes in a relatively static setting. (Tr. 84-85). Aracelis Rivera, Psy.D. affirmed the initial findings on May 14, 2018. (Tr. 100-02).

Gary Hinzman, M.D., found that Mr. Duty was limited to occasional hand controls and frequent handling and fingering on the left due to his carpal tunnel syndrome, and included postural limitations due to Mr. Duty's morbid obesity. (Tr. 81-84). Dr. Hinzman did not include upper extremity limitations on the right. (*Id.*). Mr. Duty was found able to perform light work with

23

additional limitations and determined not disabled. (Tr. 86-87). Yeshwanth Bekal, M.D., affirmed the initial findings on May 14, 2018. (Tr. 100).

**Dr. Shah.** On August 26, 2019, Dr. Shah provided a note indicating Mr. Duty benefits from the use of a cane due to his right hip pain. (Tr. 876). Dr. Shah also indicated Mr. Duty benefits from the use of wrist splints due to carpal tunnel syndrome. (*Id.*).

**Dr. McCullough.** On August 30, 2019, Dr. McCullough completed a residual functional capacity report. (Tr. 879-83). In it, Dr. McCullough indicated Mr. Duty had been treated at his clinic since 2017. (Tr. 879). Dr. McCullough indicated Mr. Duty would have issues with crying spells and require extra reminders at work on a weekly basis. (*Id.*). Mr. Duty could only handle low-stress jobs with little changes due to "terror." (*Id.*). Dr. McCullough noted Mr. Duty had depressed mood, diminished interest in activities, sleep disturbance, decreased energy, feelings of worthlessness, difficulty concentrating, and suicidal thoughts; he had extreme limitations in the ability to interact with others and adapt and managing himself, and that his mental health conditions were serious and persistent. (Tr. 880). Dr. McCullough indicated similar problems regarding Mr. Duty's anxiety disorder, including limitations in his ability to interact with others outside of his home. (Tr. 881). Ultimately, Dr. McCullough checked boxes indicating that Mr. Duty met the requirements of Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders). (Tr. 880-82). Dr. McCullough indicated Mr. Duty's subjective complaints were consistent with his diagnosis. (Tr. 883). In Dr. McCullough's opinion, Mr. Duty would be off task at work up to 15 percent of the time. (*Id.*).

## V.   OTHER EVIDENCE

Meg Hamill, with whom Mr. Duty lived for over 20 years, wrote a letter describing Mr. Duty's physical limitations. (Tr. 577-78). In it, she described Mr. Duty's sporadic mobility issues and his use of a cane due to balance issues. (*Id.*). Ms. Hamill described Mr. Duty's condition as worsening, and stated that he has used the cane "almost constantly" to get around the house. (*Id.*). Ms. Hamill also described Mr. Duty's hand pain making it difficult for him to lift more than five pounds with his right. (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision, dated December 30, 2019, included the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since November 20, 2017, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, cervical and lumbar radiculopathy, tendinosis of the bilateral hips, carpal tunnel syndrome of the right hand, osteoarthritis of the left hand, chronic pain syndrome, fibromyalgia, migraines, obesity, depressive disorder (diagnosed as persistent depressive disorder, major depressive disorder, and dysthymia), generalized anxiety disorder, somatic symptom disorder, personality disorder, and posttraumatic stress disorder (PTSD) (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: he can stand or walk for four hours in an eight hour workday, but must be permitted to alternate positions between sitting and standing at intervals of 30 minutes or longer while remaining at his work station and on task; he can occasionally operate hand controls and frequently handle or finger with his bilateral upper extremities; he can

25

occasionally operate foot controls with his bilateral lower extremities; he can occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds; he can frequently balance, and occasionally stoop, kneel, crouch, or crawl; he must avoid all exposure to bright lights such as headlights, flashlights, spot lights, or strobe lights; he must avoid all exposure to workplace hazards such as unprotected heights; he can perform simple, routine tasks, but not at a production rate pace (as in assembly line work), and not with strict production quotas; he can interact occasionally with others, with no responsibility for sales, arbitration, negotiation, confrontation, conflict resolution, or the safety or welfare of others; he can never interact with members of the public as part of his job duties; and he can adapt to occasional changes in the work setting or routine, so long as those changes are explained in advance and implemented gradually.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born on April 2, 1969 and was 48 years old, which is defined as a younger individual age 45-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English. (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since November 20, 2017, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-26).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Mr. Duty argues the ALJ erred at Step Four by failing to review medical documentation related to Mr. Duty's right hip impairment, and erred by finding the opinions of Drs. McCullough and Shah unpersuasive. (Pl.'s Br., ECF #14, PageID 969). The Commissioner responds that the ALJ adequately reviewed the record and created an RFC with limitations appropriate to Mr. Duty's abilities, particularly with respect to his right hip impairment. (Comm'r's Br., ECF #16, PageID 1000-05). Moreover, the ALJ properly considered all of the opinion evidence and articulated her reasoning in accordance with the regulations. (*Id.* at PageID 1005-12).

I agree with the Commissioner. For the reasons that follow, I find the ALJ's decision was supported by substantial evidence and recommend the district court affirm.

### A.  The ALJ appropriately considered Mr. Duty's right hip impairment at Step Four and formed an RFC appropriate to his abilities.

At Step Four of the sequential evaluation process, the ALJ created an RFC and included a number of limitations according to Mr. Duty's medically determinable impairments:

> [Mr. Duty] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: he can stand or walk for four hours in an eight hour workday, but must be permitted to alternate positions between sitting and standing at intervals of 30 minutes or longer while remaining at his work station and on task; he can occasionally operate hand controls and frequently handle or finger with his

29

bilateral upper extremities; he can occasionally operate foot controls with his bilateral lower extremities; he can occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds; he can frequently balance, and occasionally stoop, kneel, crouch, or crawl; he must avoid all exposure to bright lights such as headlights, flashlights, spot lights, or strobe lights; he must avoid all exposure to workplace hazards such as unprotected heights; he can perform simple, routine tasks, but not at a production rate pace (as in assembly line work), and not with strict production quotas; he can interact occasionally with others, with no responsibility for sales, arbitration, negotiation, confrontation, conflict resolution, or the safety or welfare of others; he can never interact with members of the public as part of his job duties; and he can adapt to occasional changes in the work setting or routine, so long as those changes are explained in advance and implemented gradually.

(Tr. 19-20). Mr. Duty contends this RFC is inappropriate to his hip osteoarthritis impairment, stating "**[t]he whole medical review at step four (4) failed to discuss any treatment records to [Mr. Duty's] hip.**" (Pl's Br., ECF #14, PageID 977) (emphasis in original). Mr. Duty concedes the ALJ considered Mr. Duty's hip impairment as a tendinosis issue and not as an osteoarthritis issue, but continues to assert that "the decision lacks any actual review of relevant information and restrictions relating to [Mr. Duty's] hip." (*Id.* at 976).

The ALJ alone is responsible to form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The RFC is to be an assessment of the claimant's remaining capacity for work once the claimant's limitations have been considered. *Id.* at 632. An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* An ALJ "is only required to

incorporate those limitations" the ALJ "has deemed credible" and may reject limitations or impose more restrictions. *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). Doing so does not mean an RFC is not supported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015).

Particular to the use of a cane, SSR 96-9p requires "medical documentation establishing the need for a hand-held assistive device . . . describing the circumstances for which it is needed." It requires the ALJ consider the context of the circumstances in which a cane is required: "The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation . . . the unskilled sedentary occupational base will not ordinarily be significantly eroded." *Id.*

Dr. Shah's note on August 26, 2019 provides as follows: "Darrel Duty was seen in my clinic on 8/26/2019. He does benefit from use of his cane due to his right hip pain. Also he benefits from his wrist splints due to his carpal tunnel syndrome." (Tr. 876). Because the note does not provide the circumstances for which a cane is needed, it does not meet the requirements of SSR 96-9p. *Golden v. Berryhill*, No. 1:18-cv-00636, 2018 WL 7079506, *19 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted*, 2019 WL 415250 (N.D. Ohio Feb. 1. 2019).

But even though Dr. Shah's note did not meet the requirements under SSR 96-9p, it is clear that the ALJ considered not only Mr. Duty's right hip impairment, but also included a number of limitations to the RFC in response. Despite Mr. Duty's claim that the ALJ failed to discuss "any" of the relevant evidence, the ALJ's discussion of Step Four contains numerous references to Mr. Duty's right hip impairment, as follows:

- "Regarding physical impairments, [Mr. Duty] testified that he experiences back, **hip**, and wrist pain that makes it difficult for him to sit or stand for long periods

31

. . . . He stated that his is able to sit for around 30 minutes at a time, he typically uses a cane, and when not using one, can walk for about 15 minutes **before experiencing hip pain**." (Tr. 20) (emphasis added).

- "[Mr. Duty] is unable to perform activities **involving twisting his hips** . . ." (Tr. 21) (emphasis added).

- "Despite [Mr. Duty's] allegations, the medical evidence is consistent with the residual functional capacity above. [Mr. Duty] has a history of degenerative disc disease of the lumbar spine, cervical and lumbar radiculopathy, **tendinosis of the bilateral hips** . . ." (*Id.*) (emphasis added).

- "[Mr. Duty] also obtained an MRI of the pelvis at this time based on a history of sacrococcygeal disorders, weakness on the right side, and **right hip pain**. This study showed no evidence of stress fracture or stress response within sacrum or coccyx, there was no evidence of sacroiliitis, there was **moderate tendinosis with low-grade partial-thickness interstitial tearing of the right gluteus minimus and medius, with mild left gluteus minimus and medius tendinosis,** but no tearing, and there was mild tendinosis and low-grade partial-thickness interstitial tearing of the conjoined tendon origin." (*Id.*) (emphasis added, internal citations omitted).

The ALJ also considered the effects of Mr. Duty's right hip impairment during the hearing and asked hypotheticals of the VE, including:

- Standing and walking for four hours in an eight-hour workday, and a sit/stand option allowing the individual to alternate positions every 30 minutes. (Tr. 63).

- Use of a cane for ambulation longer than 15 minutes, for both sedentary and light exertional levels. (Tr. 65-66).

The VE confirmed these limitations were not work preclusive and identified jobs a hypothetical individual so limited could perform. (Tr. 63-66). As suggested in SSR 96-9p and confirmed by the VE's testimony, the use of a cane for ambulation does not preclude an individual from working.

Mr. Duty's assertion that the ALJ "cherry picked" the evidence and avoided any citation as to the use of a cane (Pl.'s Reply Br., ECF #17, PageID 1016) is not borne out by a review of the record. The RFC, including all relevant limitations determined by the ALJ, is well within the ALJ's

"zone of choice" and fulfills the substantial evidence standard. I decline to disturb the ALJ's decision on this ground.

### B.   The ALJ properly articulated her consideration of the opinions of Drs. McCullough and Shah.

Mr. Duty next contends the ALJ further erred in her Step Four consideration of the opinions of Drs. McCullough and Shah, arguing that her articulated decision fell short of the regulations and law; in support, he points to the consideration of all five factors found in 20 C.F.R. § 416.920c(c)(1)-(5). (Pl.'s Br., ECF #14, PageID 977-89). The Commissioner responds that the ALJ is only required to articulate two of the five factors—supportability and consistency—and the ALJ did just as required. (Comm'r's Br., ECF # 16, PageID 1005-11). I agree with the Commissioner; the ALJ articulated the supportability and consistency of the medical opinions sufficient to guide my review.

Because Mr. Duty filed his application after March 27, 2017, his case is evaluated under the regulations found in 20 C.F.R. § 416.920c. Under these regulations, the ALJ is to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 416.920c(b). The regulations define a medical opinion as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. § 416.913(a)(2).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source

controlling weight. *Id.* at § 416.920c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors"—supportability[5] and consistency.[6] *Id.* at § 416.920c(b). An ALJ must explain how she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 416.920c(b)(2), (3).

An ALJ may rely on the limitations contained in a medical opinion when forming the RFC, but is not required to adopt all opined limitations, even if she finds the opinion persuasive. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 269 (6th Cir. 2015). The ALJ is required only to say enough to allow this Court to trace the path of the reasoning in the decision. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011).

Here, the ALJ articulated her evaluation of Dr. Shah's opinion as follows:

> Dr. Shah stated that [Mr. Duty] would benefit from a cane due to right hip pain and would benefit from wrist splints due to carpal tunnel syndrome. Dr. Shah did not provide a function-by-function analysis of specific limitations, stated in vocational terms, nor [did] he provide supporting evidence or explanation for these limitations (aside from pointing to the claimant's diagnoses and subjective allegations of right hip pain). Moreover, any opinion that the claimant requires a cane in a workplace would be inconsistent with the medical record as described above, including the claimant's generally unremarkable diagnostic and clinical findings, conservative treatment history, and varied activities of daily living such as working as a nanny for 18 years.

---

[5] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 416.920c(c)(1).

[6] "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 416.920c(c)(2).

(Tr. 24). As provided above, Dr. Shah's short statement regarding Mr. Duty's use of a cane was not sufficient under SSR 96-9p to show the circumstances in which Mr. Duty's use of a cane was medically necessary. (*Compare* Tr. 876 *with* SSR 96-9p). The ALJ's decision recognizes this, and explains that Dr. Shah's statement was because it was inconsistent with, and not supported by, the record. (Tr. 24).

Mr. Duty points to numerous instances in the record where he used a cane and was wearing wrist braces or where he reported symptoms of pain. (Pl.'s Br., ECF #14, PageID 980-85). But subjective symptom statements do not transform into medical evidence by mere incorporation into a medical record. *Roberts v. Comm'r of Soc. Sec.*, No. 1:14-CV-355, 2015 WL 3936177, at *4 (W.D. Mich. June 26, 2015). Mr. Duty also points the Court to the non-required factors found in 20 C.F.R. § 416.920c. (Pl.'s Br., ECF #14, PageID 979). But, as he concedes, the ALJ articulated her consideration grounded in the "most important factors" of supportability and consistency, as per § 416.920c(b). Accordingly, I find no reason to conclude the ALJ's consideration of Dr. Shah's opinion is not supported by substantial evidence.

As to Dr. McCullough opinion, the ALJ articulated her consideration as follows:

The undersigned finds the opinions of treating doctor McCullough unpersuasive (Exhibit 23F). Dr. McCullough determined that the claimant can handle few workplace changes, is unable to travel, drive, or deliver for work, cannot have strict production quotas, is able to complete simple, routine tasks, can interact with others 11 to 33 percent of the workday, would require weekly reminders or assistance to complete tasks, and would have issues with handling work criticism. He also concluded that the claimant meets the requirements of Listings 12.04 and 12.06 due to having marked or extreme limitations in "paragraph B" criteria of interacting with others and adapting or managing oneself, and would also meet the "paragraph C" criteria of these Listings. Additionally, Dr. McCullough concluded that the claimant

35

would miss more than three workdays per month due to his impairments and would be off task 15 percent of the workday.

These opinions as a whole are generally inconsistent with the medical record, including the claimant's mostly unremarkable reported symptoms to providers, without evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues, and in light of his significant improvement with psychiatric medications and treatment (Exhibit 9F; 13F; 16F; 20F). Moreover, Dr. McCullough provided little explanation or supporting evidence for these extreme limitations. Nevertheless, some of these limitations are consistent with the medical record – such as avoiding strict production quotas and a limitation to the performance of simple, routine tasks – and have been accounted for in the above residual functional capacity.

(Tr. 23). Here, the ALJ again described the factors of supportability and consistency that she used to evaluate Dr. McCullough's opinion. Despite finding it unpersuasive, she still found certain aspects consistent with the medical record and incorporated those factors into the RFC as she determined appropriate.

I find here no failure by the ALJ to create an "accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877. Even if Mr. Duty can point to substantial evidence, or even a preponderance of evidence, that supports an opposite conclusion (Pl.'s Br., ECF #14, PageID 986-89), this Court cannot overturn the ALJ's conclusion "so long as substantial evidence supports [it.]" *Jones,* 336 F.3d at 477. I find no reason to overturn the ALJ's decision on this basis.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I

recommend the District Court **AFFIRM** the Commissioner's decision.

Dated: March 21, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

37